1  KELLY M. KLAUS (CA Bar No. 161091)
   kelly.klaus@mto.com
2  ELIZABETH A. KIM (CA Bar No. 295277)
   elizabeth.kim@mto.com
3  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, Fiftieth Floor
4  Los Angeles, California 90071-3426
   Telephone:  (213) 683-9100
5  Facsimile:   (213) 687-3702

6  MICHAEL B. DESANCTIS (admitted *pro hac vice*)
   michael.desanctis@mto.com
7  MUNGER, TOLLES & OLSON LLP
   1155 F Street N.W., Seventh Floor
8  Washington, D.C. 20004-1357
   Telephone:  (202) 220-1100
9  Facsimile:   (202) 220-2300

10 KAREN R. THORLAND (CA Bar No. 172092)
   karen_thorland@mpaa.org
11 MOTION PICTURE ASSOCIATION OF AMERICA, INC.
   15301 Ventura Blvd., Building E
12 Sherman Oaks, California 91403
   Telephone: (818) 935-5812
13
   Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Universal City Studios LLC; Columbia Pictures Industries, Inc.; Disney Enterprises, Inc.; Twentieth Century Fox Film Corporation; Paramount Pictures Corporation; Warner Bros. Entertainment Inc.; Amazon Content Services, LLC; Netflix Studios, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>Tickbox TV LLC,<br><br>Defendant. | Case No.  2:17-cv-07496-MWF(AS)<br><br>**DECLARATION OF DAVID P. KAPLAN**<br><br>Date:   Jan. 8, 2018<br>Time:   10:00 a.m.<br>Ctrm:   5A (Hon. Michael W. Fitzgerald)<br>Filed concurrently:<br>  Notice of Motion and Motion for Preliminary Injunction; Memorandum of Points and Authorities in Support Thereof<br>  Declaration of Prof. Ian Foster<br>  Declaration of Jan van Voorn<br>  Declaration of Kelly M. Klaus<br>  [Proposed] Order |

I, David P. Kaplan, declare as follows:

1. I am Senior Vice President and Intellectual Property Counsel at Warner Bros. Entertainment Inc. ("Warner Bros."), one of the Plaintiffs in this action. I submit this declaration in support of Plaintiffs' motion for a preliminary injunction. Except as to those matters stated on information and belief, the facts stated herein are known to me personally. As to those matters stated on information and belief, I am informed of the facts and believe them to be true. If called upon and sworn as a witness, I could and would testify competently to the contents of this declaration.

2. In my position, I am the head of the content protection and analytics group at Warner Bros. I have responsibility for content protection issues involving piracy of Warner Bros.' motion pictures, television shows, and games. My responsibilities include the security for and protection of Warner Bros. content throughout all elements of the supply chain. I am familiar with Warner Bros.' strategies for the distribution of our copyrighted content, including our efforts to distribute our content to consumers across a range of digital viewing options. Through publicly available sources, such as industry publications and the media, I also have knowledge about similar efforts by other motion picture studios and the general means by which other studios, including the other Plaintiffs in this action, distribute their content.

**Warner Bros.' Content Production and Distribution Business**

3. Warner Bros. is a well-known entertainment company engaged in, among other things, the production and distribution of motion pictures and television shows ("Warner Bros.' Works"). Warner Bros. disseminates its Works to the public through numerous distribution channels. These include, among others, digital streaming services, cable and satellite television providers, DVDs and Blu-ray Discs (and box sets thereof). Warner Bros. distributes its Works through a worldwide network of authorized licensees, distributors, and retailers, including online retailers.

4. Warner Bros. and its affiliates invest substantial resources to bring motion pictures and television shows to consumers. Each project involves substantial risks. The upfront costs of producing, marketing, and distributing a major motion picture can be tens of millions of dollars or more. Warner Bros.' ability and willingness to incur these risks depends on Warner Bros.' ability to earn a return on those investments by receiving remuneration for the rights to reproduce, distribute, and perform Warner Bros.' movies and television shows.

5. Warner Bros.' ability to control the exploitation of its copyrighted works is critical to its business.

6. Warner Bros. offers its content through a range of offerings that meet customer demand and at retail price points (set by the retailers) that are calibrated to those choices. Warner Bros.' offerings include the following options, among others:

- Customers can see our movies in the theater;
- customers can buy a copy of the work on a physical disc, i.e., on DVD or Blu-ray disc;
- customers can download and license long-term digital rights to a copy through a service like iTunes;
- customers can rent a physical copy at a brick-and-mortar store or kiosk, like Redbox;
- customers they can rent a movie or television episode or series on demand for a limited period of time through a cable, satellite, or internet video-on-demand platform ("VOD"), such as iTunes or Google Play (this is sometimes referred to as "transactional VOD" or "TVOD");
- customers can access and view a movie or television episode or series on demand through a subscription streaming service like Netflix, Hulu, or HBO NOW (this is sometimes referred to as subscription VOD, or "SVOD");
- customers can, eventually, watch a movie for free on network television.

7. Each of these options is known as a "distribution channel" and is designed to provide different value to consumers matched to their willingness to pay. Based on my experience in the industry, I am aware that the other Plaintiffs in this matter utilize the same or similar distribution channels to offer their content to consumers. The commercial terms of Warner Bros.' individual agreements are proprietary and confidential. We do not share them outside our company.

8. Warner Bros., like many other studios, utilizes a practice that is known as "windowing." Windowing makes Warner Bros.' Works available through different distribution channels at different times following the initial theatrical release of a particular title. Our agreements with distributors and licensees generally provide specific restrictions on when, after a title's initial release, the distributor or licensee has the right to distribute or perform that title. Distributors and licenses generally will pay more for the right to distribute or perform movies in an earlier window—when that content is new, or newer—than for comparable rights during later windows. Some distributors and licenses will pay more for the exclusive right to distribute or perform Warner Bros.' movies during a particular time period. Warner Bros. must negotiate restrictions in other agreements to allow for such exclusivity periods.

9. Warner Bros.' digital distribution business has become increasingly important to the financial stability of the studio in recent years.

10. Warner Bros.' contractual relationships with its distributors and licensees require the investment of significant time and resources. Warner Bros. employs dozens of individuals throughout the company who work full time negotiating or maintaining the company's relationships with its digital licensees.

11. Some form of windowing is central to any motion picture distribution strategy and allows a content company to match different viewing offerings with consumers' willingness to pay.

**TickBox's Distribution of TickBox TV Threatens Immediate, Irreparable Harm to Warner Bros. and the Other Plaintiffs**

12. I am familiar with the activities of defendant TickBox in promoting and distributing its TickBox TV product. I also have reviewed the contemporaneously filed declaration of Prof. Ian Foster in support of Plaintiffs' Motion for Preliminary Injunction.

13. Defendant threatens a variety of serious and irreparable harms to Warner Bros. and the other Plaintiffs if it is permitted to continue its infringing activities.

*Defendant's Promotion and Distribution of TickBox TV Harm Plaintiffs' Relationships with Distributors and Licensees, and Undermine Their Right to Control Distribution of Their Content*

14. Defendant deliberately induces the widespread, unlicensed use of Warner Bros.' content. This unlicensed use threatens the cornerstone of our digital business—exclusive control over the distribution of our copyrighted works.

15. Every time a user accesses an unauthorized stream of one of Warner Bros.' Works, Warner Bros. is not being compensated as it would be through an authorized use of the same Work. By inducing precisely such unauthorized access, Defendant's unlawful conduct has caused, and will continue to cause, Warner Bros. this very direct and fundamental harm on a daily basis.

16. The harms from TickBox's infringing conduct go well beyond the already substantial harm of not being compensated for the exploitation of our Works. The ultimate success or failure of our business depends on a carefully designed strategy to build demand for our content with consumers across a variety of viewing options provided by our distributors and licensees. We negotiate with our distributors and licensees, among other subjects, *how* (under what conditions), *when* (on what date and for what duration), *what* (which titles), and for *how much*

(at what wholesale price) they can obtain the rights to distribute or publicly perform our content.

17. As I have discussed above, windowing is an important strategy for Warner Bros.' exercise of its exclusive right to control the dissemination of its content.

18. Because TickBox operates free from licensing restrictions, its distribution of TickBox TV has the result of making our content available during windows occupied by different distribution channels or exclusivity periods held by authorized distributors or licensees. For example, new releases are, following their theatrical release, first released to distributors that sell digital download copies or physical copies on DVDs or Blu-ray discs. During these initial home entertainment release windows, Warner Bros.' movies generally are not available for VOD streaming. TickBox TV, however, offers Defendant's customers access to numerous links to newly released titles without regard for these exclusive windows. The effect of this is to interfere with and undermine Warner Bros.' contractual commitments to and relationships with its distributors and licensees, and to undermine Warner Bros.' negotiating position for future agreements with authorized distributors and licensees.

19. TickBox's promotion and distribution of TickBox TV also undermines our theatrical releases. As explained in Prof. Foster's declaration, customers using TickBox TV can (and are encouraged to) use "addons" that feature motion pictures that are still exclusively shown only in theaters (i.e., "only in theaters"). Defendant's promotion of this activity directly undermines Warner Bros.' exclusive rights, its windowing strategy, and its ability to maximize the value of its content.

20. Warner Bros. has very detailed terms and conditions on which it has agreed to license its content to online streaming services like VUDU, iTunes, Google Play, Netflix, and others. For example, our streaming agreements generally include, among other terms: (a) detailed provisions requiring technological

measures to protect the security of the transmission of the content to ensure against unlawful access, copying, and piracy; (b) provisions requiring minimum levels of quality for the content's display, to ensure that consumers are receiving appropriate value; and (c) restrictions on making the content available during certain periods where other distributors or licensees have paid for exclusive distribution rights.

21. Unlicensed offerings such as Defendant's and the sources to which TickBox TV links exploit Warner Bros.' content independently of these and other licensing terms. This further undermines our business and the market more generally.

*Defendant's Actions Undermine Warner Bros.' and the Other Plaintiffs' Ability to Provide Licensed Offerings*

22. Warner Bros.' relationships with the companies that distribute and perform our content are very important. The success of Warner Bros.' business is very much intertwined with the success of their business.

23. I understand that current and prospective counter-parties to authorized distribution and license agreements raise issues during negotiations for new and renewed agreements, and during the duration of such agreements, that they find it difficult to compete with unlicensed services like TickBox, which do not operate in accordance with contractual requirements and do not pay for the content they exploit.

24. While unauthorized sources of content generally threaten the legitimate market for authorized content, the promotion and distribution of TickBox TV and other similar products have spurred significant growth in the use, access, and popularity of such illegal sources of content.

25. Based on my experience in the industry and understanding of illegal services against which Warner Bros. and its distributors and licensees must compete, I believe the growth of illicit addons and sources of illegal conduct is fueled in part by the ease and convenience of the infringement that Defendant

-6-

induces.  I understand that TickBox TV, loaded with the illicit addons that Defendant encourages its customers to utilize, provide those customers with the ability to quickly and easily locate dozens, and sometimes hundreds, of unauthorized sources for all of the latest and most popular content.

26.   For example, Warner Bros. released its super-hero hit movie *Justice League*  on November 17, 2017 .  *Justice League* is scheduled to become available through a variety of authorized U.S. distribution channels, including VOD services like iTunes and Google Play in February 2018.  While Warner Bros.' and other authorized distribution channels offer consumers the ability to "pre-order" the digital release of *Justice League*, it is currently in its most exclusive "window": theatrical release.  TickBox TV offered its customers access to unauthorized streams of *Justice League* long before Warner Bros. had authorized any non-theatrical distribution of its copyrighted work.  As demonstrated by the screenshots below, on November 29, 2017, less than two weeks after Warner Bros. released *Justice League* to theaters, a TickBox TV customer who searched for *Justice League* would have easy and unauthorized access to the title.



1  With just a few clicks, a TickBox customer could immediately begin streaming the
2  infringing copy of *Justice League.*



27. Without TickBox TV, Defendant's customers might search one website at a time to attempt to locate an unauthorized stream of *Justice League*. Even if that customer were to locate a source for that movie, he or she could be disappointed with broken links, slow connection speeds, or low-resolution video. If that source did not provide other links to working or high-speed, high-resolution streams of the content, the customer then would have to search for such content from another source.

28. TickBox TV, used as Defendant intends and encourages, does most of the heavy lifting for customers and reduces or eliminates at least two significant obstacles that customers desiring access to infringing content previously faced: locating infringing material, and accessing functioning, high-speed, and high-quality sources for that material.

29. TickBox TV also offers Defendant's customers a premium experience at no direct cost, contributing to a mistaken and incredibly harmful perception that, other than the customers' payment to TickBox, content should be instantly and conveniently accessible for free. I am informed and believe that TickBox TV does not appear to use advertising or to charge customers users for the use of addons or accessing infringing streams. The interfaces for the addons that TickBox encourages its customers to use offer user-friendly, visually appealing interfaces that mimic the interfaces of legitimate VOD services like iTunes, Hulu, and others. For example, in the screenshot below, a TickBox customer who selected the "In Theatres" category on November 22, 2017, would view a list of popular titles that—when selected—feature a high-quality thumbnail of artwork associated with the title.

30. Rather than pay for legitimate, authorized VOD services like Netflix, Hulu, or Google Play, Defendant's customers are able to use the TickBox TV device to access our content, in an environment designed to be user-friendly, at no cost beyond the purchase of the TickBox TV device.

-9-

31. For the foregoing reasons, Defendant's TickBox TV poses a significant threat to the entire legitimate market for home entertainment, and in particular, for the online distribution market. Defendants' unlicensed offering further threatens the development and growth of the legitimate on-demand streaming market because use of the device inculcates Defendant's customers to the belief that high-speed and high-quality content can be accessed at no cost and with no advertisements. This threatens the very foundation of Warner Bros.' business and the businesses of its distributors and licensees.

32. The extent of Warner Bros.' losses arising from Defendant 's ongoing, illegal competition with Warner Bros., regarding content that Warner Bros. itself created or owns, cannot be calculated with precision, nor are these damages likely to be recoverable from TickBox, which I understand is owned or controlled by a small number of individuals.

33. Without the relief requested in this action, Defendant's infringing activities will continue unabated and Warner Bros. will continue to suffer irreparable harm that no future damages award can mitigate.

34. Based on my understanding of the industry, I believe the harms to the other Plaintiffs from Defendant's infringing activities are comparably imminent and irreparable as the harms to Warner Bros.

-10-

1  I declare under penalty of perjury under the laws of the United States that the
2  foregoing is true and correct, and that this declaration was executed on this 6th day
3  of December 2017 at Burbank, California.

_____
DAVID P. KAPLAN